MOFFETT et al. v. TEXAS EMPLOYERS'
INS. ASS'N.

No. 4590.

Court of Civil Appeals of Texas.  El Paso.

Nov. 3, 1948.

Rehearing Denied Nov. 24, 1948.

White & Yarborough and Donald V. Yarborough, all of Dallas, for appellants.

Burford, Ryburn, Hincks & Ford and Howard Jensen, all of Dallas, for appellee.

PRICE, Chief Justice.

This is an appeal from the judgment of the District Court of Dallas County, 95th Judicial District. It is a workman's compensation case. W. J. Day filed suit against the Texas Employers' Insurance Association to set aside the award of the Industrial Accident Board. . Appellee, Texas Employers' Insurance Association was the insurance carrier of Ballard Burgher & Co. Ballard Burgher & Co. was the trade name of Ballard Burgher. At the close of the evidence the trial court instructed a verdict in favor of the insurance carrier and entered judgment in his favor. Before this appeal was perfected W. J. Day died, and his only heir, Stella Moffett, his daughter, perfected this appeal.

The motion for an instructed verdict set up in substance that the evidence established that on December 24, 1943, the time Day, the plaintiff, received his injuries, he was not an employee of Ballard Burgher & Co., but was an employee of Overpass Auto Park, Inc., a corporation; further that even though W. J. Day was on the 24th day of December an employee of Ballard Burgher that it was in a separate and distinct employment from that covered by the insurance policy.

In our consideration of this case we shall assume that if covered by the policy Day suffered in the course of his employment a compensable injury. The real and determining question of this case is, was Day at the time of his injury covered by the Workmen's Compensation policy covering the employees of Ballard Burgher. His injuries were suffered on December 24, 1943, in the course of his employment while working on a parking lot which purported to be conducted by a corporation, the Overpass Auto Park, Inc.

Burgher purchased the property on which the parking lot was maintained in July 1941, and about a year thereafter he leased it to The Classified Parking System to use as a parking lot. The said lessee so operated the property until the spring of 1943; on or about that date the T. & P. Railroad put up a fence that interfered with the use of the property as a parking lot; Burgher took back the property.

Day had worked on the parking lot as an employee of lessee, and when Burgher took it back and sought to make it again usable as a parking lot by constructing an overpass, Day worked on this property after it was taken back by Burgher, and was paid by Burgher up to October, 1943. On or about this date the Overpass Auto Park, Inc., took over the property and continued to operate same as a parking lot thereafter, and up to the date of his injury Day was paid weekly by checks of this latter corporation. The Overpass Auto Park, Inc., operated under a lease from Burgher, made September 20, 1943. The Overpass Auto Park corporation was organized shortly before it began the operation of the parking lot. Burgher owned 57 shares therein. After the corporation took over the parking lot Day was paid his weekly compensation by checks of the Overpass Auto Park corporation. He endorsed and cashed these checks and it is beyond question that he knew the. Overpass Auto Park Company was purporting to. operate the parking lot.

The appellee on September 7, 1942, issued a policy to Freedom Homes, Inc., to be in effect until September 7, 1943. An endorsement was added to this policy naming Burgher as an employer. Burgher at the time had begun or was about to begin the construction of 143 houses for the Freedom Homes Corporation. This policy and its endorsement listed a premium for carpenters, masons, painters, sheet metal workers, etc., but did not list premiums for parking lot employees. For these various employ-

ments it gave code numbers. It was shown without dispute that workmen's compensation premium rates are fixed by the Board of Insurance Commissioners of Texas, and different business activities carry different premium rates,. and the rates are referred to by code numbers. The code number 8392 covered the classification of automobile storage, garages and parking lots. The appellee issued the policy in suit, No. B-23416 to Freedom Homes Inc., and Burgher, effective from September 7, 1943, to September 7, 1944. The code numbers and classifications listed on this policy are the same as in the policy first described, and did not enumerate parking lot employees nor give the code number for this.

There was an endorsement made on the policy dated January 4, 1944, purporting to be effective from September 7, 1943, including the classification shown by code No. 8392, which was for automobile storage and parking lot employees. As has been stated, Day's injury was suffered on the 24th day of December, 1943. It is not contended that on the date of this endorsement that Burgher did not know of the injury to Day. There is no contention the insurance carrier knew or had notice prior to making the endorsement on January 4, 1944, that on December 24, 1943, Day had received the injury relied on for sustaining his claim for compensation. The building activities carried on by Burgher and the parking lot had no connection the one with the other. The activities were separate and distinct.

Burgher, a short time after the injury to Day, notified the insurance company thereof.

A new trial was sought on the ground of newly discovered evidence, to-wit, that appellee paid a doctor's bill for attendance on Day, and a hospital bill after the giving of notice by Burgher. Appellee denied under oath that Day was an employee of Burgher. It was as an employee of Burgher the compensation was sought.

Appellee further contends that if Day was an employee of Burgher that it was in a separate and distinct employment from that covered by the insurance policy sued upon; and that the attempted endorsement on the policy adding code number 8392 to the policy was made on January 4, 1944, after the accident happened on December 24, 1943, and said endorsement was not to be given retroactive application, despite its provision to make it effective September 7, 1943, for the reason that the agent signing said endorsement was without authority as a matter of law and as a matter of fact to make it retroactive, and further there was no consideration for such retroactive provision.

■ It is elementary that under the sworn pleading of appellee in order to entitle Day to recovery the burden was upon him to show by a preponderance of the evidence that he was an employee of defendant Burgher, and covered by the policy sued upon.

Let us first determine the legal effect of the endorsement made January 4, 1944, after Day had received his injury on, to-wit, December 24, 1943. The endorsement purports to make the coverage of the parking lot employees' retroactive to September 7, 1943. It must be borne in mind that appellee had denied under oath that Day was covered by the policy. There was no evidence that the agent making the endorsement had the authority to so enlarge the coverage of the policy. The endorsement, however, does bear the stamp of the Board of Insurance Commissioners, purporting to approve same as of January 20, 1944.

■ An agent, whether he is merely a soliciting agent or a general agent authorized to write insurance and countersign policies, has no authority to cover a pre-existing loss. United States Casualty Co. v. Rodriguez, Tex.Civ.App., 288 S.W. 487, Wr. Ref.; Bankers Lloyds v. Montgomery, Tex.Com.App., 60 S.W.2d 201.

■ Prior to the endorsement there is no evidence of the omission of the classification of parking lot employees throught accident or mistake. There is no evidence that prior to this endorsement there was an agreement that the policy should cover this classification; there is lacking any evidence of the authority of the agent to make the endorsement. On account of the failure of the evidence to

show authority on the part of the agent of appellee to make such endorsement, same was without legal consequences and did not extend the policy to cover the employees of Burgher engaged in parking lot activities. It is elementary that in order to be covered by a policy issued to the insured the workman must be an employee of the insured. After October 1943 the parking lot business theretofore conducted by Burgher thereafter purported at least to be conducted by the Overpass Auto Park Company, a corporation. Burgher, it is true, owned 57 shares of the corporate stock. Day's weekly pay checks were those of this corporation; from week to week he endorsed and cashed them. Burgher about or prior to October 1, 1943, had leased the parking lot property to this corporation. Burgher as president of the corporation gave when the occasion arose orders to Day; however it is fair to assume they were as president of the corporation. The inference is inescapable that prior to December 24, 1943, that Day knew there had been or purported to be a change in the ownership and operation of the parking lot. Prior to October 1943 his pay checks were issued by Burgher, subsequent to that date they were issued by the Overpass Auto Park, Inc. The evidence fails to show that on the date of the injury Day was an employee of Burgher. There may be a scintilla of evidence that in fact the operation of the Overpass Auto Park, Inc. was the individual activity of Burgher; Burgher was its president and a large stockholder therein, and it was consistent that as such he should control the management. We are of the opinion that the evidence was insufficient to raise the issue that Day was an employee of Burgher at the time he received the injury.

■ If we should be mistaken in this construction of the evidence, and the evidence was sufficient to raise the issue that Day on the 24th of December, 1943, was an employee of Burgher, still it is thought he was not covered by the policy. The parking lot business was separate and distinct from the construction business which was unquestionably covered by the policy in the suit. Aside from the endorsement made subsequent to the injury there is

nothing in the policy to show that parking lot employees were intended to be covered thereby. The fact that Freedom Homes and Burgher are named as the insured is a circumstance indicating that the policy was only intended to cover the construction business of Burgher, insofar as Burgher was concerned. The classifications determining the premiums are those of construction employees; the classification and the code number of the parking lot employees were not in the policy before the endorsement of January 4, 1944.

The following, taken from the brief of appellee, is believed to set forth the law applicable here: "(1) An employer who conducts two separate and distinct kinds of business, each business involving a different risk and payroll, and requiring a different premium for compensation insurance, may elect to insure a class of employees in one business and not to insure a class of employees in the other business. A policy of insurance covering one such class of employees will not be construed to embrace or cover employees of a different class. Barron v. Standard Accident Ins. Co., 122 Tex. 179, 53 S.W.2d 769; Buice v. Service Mutual Ins. Co., Tex.Civ.App., 90 S.W.2d 342, Wr. Ref.; Holmes v. Travelers Ins. Co., Tex.Civ.App., 148 S.W.2d 270, Wr. Ref.; Guerrero v. United States Fidelity & Guaranty Co., 128 Tex. 407, 98 S.W.2d 796; see also, Tex.Civ.App., 101 S.W.2d 592; New Amsterdam Casualty Co. v. Hosch, Tex.Civ.App., 78 S.W.2d 633, 634; Barta v. Texas Reciprocal Ins. Ass'n, Tex.Civ.App., 67 S.W.2d 433, Wr. Ref."

■ As recognized in the case of Buice v. Service Mutual Ins. Co., supra, an employer of labor operating under the Workmen's Compensation Act, Vernon's Ann. Civ.St. Art. 8306, etc., cannot cover part of his employees and leave a part of them uncovered where such employees are engaged in the same general class of business. It was well recognized that an employer who conducts two separate and distinct kinds of business, each of which involves different risks, payrolls and premium rates, may elect to insure his employees under one such business and not to insure

his employees in another business. There appears to be no logical connection between the construction business and the operation of a parking lot. The evidence discloses a connection between Burgher and Freedom Homes Corporation. Burgher was engaged in the construction of 143 houses for the latter corporation. It seemed to be the natural thing that there should be joint assurance in the policy. The parking lot, whether same was conducted by Burgher or by the Overpass Auto Park, Inc., was over a mile distant from Burgher's other operations which were covered by the policy. The effect of the endorsement of January 4, 1944 has been discussed. It is held that even though there should have been an issue of fact as to whether Burgher conducted the parking operation at the time Day was injured, as a matter of law the policy did not cover Day. Appellant, as shown by his statement under his first point of error, relies largely on the following evidence to raise the issue that Day was covered by the policy in suit. Ballard Burgher testified in part:

"Q. Mr. Burgher, isn't it a fact that following the injury to Mr. Day on the 24th of December, 1943, you made a report to the Texas Employers Insurance Association that W. J. Day was working for you, Ballard Burgher, at the time of his injury? A. I did.

* * * * * *

"Q. Now, Mr. Burgher, Mr. W. J. Day works for you—was working for you on December 24, 1943, wasn't he? A. Yes, sir.

"Q. And he was injured on that day, was he? A. He was.

"Q. What was he getting per week at that time? A. He was getting $30.00 a week less his deductions and Social Security.

"Q. How many days a week did he work for $30.00? A. If I remember he worked six days a week—they took turns about taking days off.

"Q. How long had he been working for you up to that time? A. He started to work August 12, 1943—prior to that time, however, he had worked on the same lot, but not for me.

* * * * * *

A. I told every employee—I told him; moreover I paid him on the Overpass Auto Park check every week—I have the checks right here. That (indicating) was when he was working for me—Ballard Burgher & Company.

"Q. Was there any difference in his duties when you claimed he quit working for you and went to work for them? A. No difference.

* * * * * *

"Q. How then, what did Mr. Day do in this auto park from August 12, 1943, up to December 24, 1943? A. He was assisting in collecting parking fees at 10¢ a car per day and he would occasionally clean out the ditches when the cars were rolling it in there—he stayed in the office a good deal of the time.

"Q. Now, on the day that he was hurt, he was directed on that day to sprinkle some sand on the overpass walk, wasn't he? A. Yes, it had snowed and there was ice on the overpass which lead from the factory over to this lot and he was directed by me that at any time there was ice on that bridge to sprinkle ashes or gravel or something to keep people from falling.

* * * * * *

"Q. And Plaintiff's Exhibit 2 is endorsement attached to the policy that they sent you? A. I think so, yes, sir.

* * * * * *

"Q. Mr. Burgher, I hand you Plaintiff's Exhibits 4 and 5 for identification, and ask you if those are your original records that you testified awhile ago covering the employment of W. J. Day? A. Yes, sir, they are.

"Q. Showing his earnings and deductions, both his withholding and Social Security? A. They are records of not only of that—at the time that the Overpass Auto Park, Inc., took over the operation of the parking lot we just kept it on the same card; that is M. Chambers' handwriting.

"Q. They are in the same handwriting; the same person—both cards are made by the same person? A. That's right.

* * * * * *

"Q. Now, after Mr. Day had this accident, just tell the jury briefly what happened—were you there? A. No, sir, I wasn't there, but I went out the next day as I recall. The accident occurred on this overpass bridge—he was trying to make a path for people to cross under my direction as president of the company and so they phoned me and told me that the accident had happened and I went out to see him and I sent him up to that clinic up there on the road to Grand Prairie—I am not sure where it is—

"Q. Dr. Thompson's? A. I am not sure, but he was sent up there to have his arm bound.

"Q. Let me ask you, Mr. Burgher, did he continue to stay there and draw his salary on the job for any period after that? A. He stayed on there and I will make a statement right here, because I thought Mr. Day was covered by this policy—

* * * * * *

"Q. Now then, Mr. Burgher, when this endorsement was added to the policy of insurance, it became effective on September 7, 1943, which has been introduced in evidence, it means on the endorsement, 'automobiles, garages, parking stations'; now, how many parking stations did you have at that time? A. That is the only one.

"Q. What is the only one? A. The one located on the south side of Highway 80; opposite the overpass.

"Q. Is that the one that Mr. Day was working at when he was hurt? A. Yes, sir.

"Q. That is the only one you have that these terms were to cover? A. That's right.

"Q. You never owned any other parking lot located anywhere else in Texas? A. Never have.

"Q. In any other name or anything? A. Never have.

"Q. Was this the sole one and only one you ever had an interest in? A. Yes, sir.

"Q. Or that you ever claimed to own? A. That's right.

"Q. Is that the one that was insured under this policy? A. You mean the endorsement referred to; that is the one it referred to, I guess.

"Q. You know of no other? A. That is the only one I have.

* * * * * *

"Q. Now then, Mr. Burgher, do you know that Mr. Day didn't do any manual labor after December 24, 1943? A. Yes, sir.

"Q. That's right, isn't it? A. That's correct, as far as I know, he didn't; he had his arm bandaged up.

"Q. He was sitting in the office the only times you ever saw him after December 24? A. No, he walked around.

"Q. Mr. Burgher, did you, or your company, Ballard Burgher & Company, that you testified previously was your sole ownership, either you or the company make a report to the Texas Employers Insurance Association within nine days after December 24, 1943, or by January 2, 1944, that Mr. W. J. Day was injured while working for you, Ballard Burgher, or Ballard Burgher & Company? A. I can't answer that; I can say this, that the report was made that he was injured within that time; I don't know that it was just like I stated; I know of my own knowledge that the report was made within that time that he was injured and where he was hurt.

"Q. Do you know that it was made showing that he was working for Ballard Burgher & Company? A. I don't know that, no, sir.

"Q. Who signed the report? A. I sign all the reports; they prepare them in the office and I sign them.

"Q. Now, you have remembered these things that Mr. Ford asked you; do you have any recollection of whose name appears at the foot of that report—the name that appears as being signed by? A. Well, I presume you have reference to the name signed to the report—I signed it individually.

"Q. You signed the report individually? A. Whenever any accident happens they bring the report to me, if I am there, if not, somebody else, but I usually sign them.

"Q. And you signed such a report individually? A. I usually do if I am there.

\* \* \* \* \* \*

"Q. Mr. Burgher, isn't it a fact that following the injury to Mr. Day on the 24th of December, 1943, you made a report to the Texas Employers Insurance Association that W. J. Day was working for you, Ballard Burgher, at the time of his injury? (Objection to this question overruled by the Court) A. I did."

■ It is thought that the foregoing is insufficient to extend the coverage of the policy. The policy, when construed in the light of the circumstances, is clear and unambiguous.

■■ Appellant sought a new trial on the grounds of newly discovered evidence. It was claimed that since the trial it had been discovered that after Burgher gave notice of the injury to Day that appellee paid Dr. B. M. Thompson $71 for medical treatment of Day and paid Methodist Hospital of Dallas $19.40 for the services rendered to W. J. Day by reason of personal injuries sustained by him, the basis of his claim for compensation. The question of granting a motion for new trial on the ground of newly discovered evidence rests largely within the sound discretion of the trial judge. It is a judicial discretion, however. Dr. Thompson testified as a witness on behalf of Day, and if these be facts it nowhere appears that Dr. Thompson concealed them from Day or his attorneys. Day certainly knew that he had not paid Dr. Thompson's bill, had not paid the hospital bill. In our opinion the trial court did not abuse his discretion in refusing a new trial on the grounds of newly discovered evidence There are other points of error complaining of the rejection of evidence. None of them are thought to be meritorious. The acts and beliefs of Burgher were not evidence against appellee. Had the evidence been admitted the rejection of which is complained of, it would not have changed the result in any way.

There is no error requiring a reversal of the case. It is therefore ordered that the same be in all things affirmed.