**Lorraine E. RECUPITO et al.**

v.

**INTER–OCEAN INSURANCE CO.**

Civ. A. No. 71–1631.

United States District Court,
E. D. Pennsylvania.

Aug. 7, 1973.

Joseph A. Coffey, Jr., Barton A. Haines, Philadelphia, Pa., for plaintiffs.

John J. Dautrich, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

BECHTLE, District Judge.

This matter is before us on the parties' cross-motions for summary judgment in an action in which recovery is sought for the face amount of a life insurance policy never issued by defendant.

Leonard J. Recupito, Jr. ("Recupito") then 43 years of age, seeking to establish a ready cash estate to protect his family, consisting of his wife, two daughters and his parents, in the event of his untimely death, sought the assistance of Richard C. Bannon, C.L.U. ("Bannon"). Bannon was a licensed insurance broker and a licensed life insurance agent, employed by Mutual Benefit Life Insurance Company as an authorized agent to sell group life insurance on its behalf. He was also a special employee of Alden-Levine Associates, 1845 Walnut Street, Philadelphia, Pennsylvania. Bannon recommended that Recupito obtain $200,000 of life insurance instead of the $100,000 coverage sought by him. Since another company had declined to insure Recupito, Bannon recommended, among others, the defendant, an insurance company which specializes in insuring the lives of people who do not meet the qualifications of standard underwriting. In response to Bannon's inquiry through Alden-Levine Associates, an authorized agency for defendant, defendant sent a document dated January 8, 1971, through the mail known as a "Tentative Quote" indicating that it was interested in issuing a five-year renewable convertible policy in the maximum face amount of $200,000 on the life of Recupito, the premium to be determined from standard Table 2 rates. The quote was made dependent upon receipt by defendant of a formal application, medical examination report, an electrocardiogram ("EKG") recording, an X-ray,

home office specimen, and an "inspection report" (i.e., a credit rating report).

On Wednesday, January 13, 1971, Recupito, as the proposed insured, signed Part I of two applications, each for $100,000 of five-year renewable convertible term life insurance. Each was addressed to defendant and showed that a premium of $57.28 was to be charged on a monthly basis. The amount was at the standard rate and was selected by Bannon on the assumption that Recupito would qualify for that rate instead of a higher one. Part I of each application was dated at Philadelphia, Pennsylvania, on January 13, 1971, by Bannon and signed by him as a witness for Alden-Levine Associates. The first application was for a policy to be obtained by Recupito naming his parents as beneficiaries; the other for a policy to be obtained by his wife on which she was named beneficiary. On the same day, a medical doctor selected by defendant, after interrogating and examining Recupito, filled out Part II ("Answers made to the medical examiner" by the proposed insured) and Part III ("Medical examiner's report") of each application. In Part III, the doctor reported that his overall estimate of Recupito's health was "First Class," in contrast to "Good," "Fair," or "Poor."

Part I of each application, in pertinent part, provided: "It is Hereby Agreed that the insurance applied for shall not be in effect until the issuance and delivery of the policy and the payment of the first premium thereon while the Proposed Insured . . . [is] in sound health, *except as may be provided in the Conditional First Premium Receipt detached herefrom [Part I] and issued if the premium be paid in advance . . . .*" (Italics supplied.)

The conditional receipt, the insurability determination type, referred to in each application is in the following form:

"CONDITIONAL FIRST PREMIUM RECEIPT

"Received from _____ the sum of $ _____ which is the amount shown in item 23 of Part I of the application to Inter-Ocean Insurance Company bearing the same date as this receipt. This payment is received subject to the agreements contained in Part I of the Application, and the terms and conditions printed on the reverse side hereof. Any remittance not in cash is received subject to actual cash payment.

Dated at _____ this _____ day of
      City    State
_____, 19___

_____
Soliciting Agent" (Italics supplied.)

The reverse side set forth, *inter alia*, that the insurance applied for shall be in force as of the date of death of the proposed insured provided he is insurable on the date of the application as a standard risk in accordance with the practice of the company governing the acceptance of risks for the plan and amount of insurance applied for at the company's published premium rate for his classification of risk.[1]

---

1. The reverse side of the Conditional First Premium Receipt, under the heading "TERMS AND CONDITIONS," states in relevant part:

"A. If death of the Proposed Insured . . . occurs on or after the date of the application for insurance . . . and before the date the policy or contract is actually issued by the Company, *then, the insurance applied for shall be in force as of the date of such death,* provided: . . . and (3) *such Proposed Insured . . . [is] insurable on the date of the application . . . as a standard risk* (or as an extra risk solely by reason of occupation or aviation activities) *in accordance with the practice of the Company governing the acceptance* of risks for the plan and amount of insurance applied for at the Company's published premium rate for his or her classification of risk, and (4) the Proposed Insured . . . [is] on the date of this receipt in good health, and (5) the liability of the Company shall in no event exceed a total of $50,000 including accidental death benefits and any insurance applied for in another application evidence by the terms of a like conditional first premium receipt.

"B. Unless all conditions of Paragraph A of this receipt are met as stipulated, this receipt shall operate as a receipt for a premium deposit only and no insurance shall be in effect until the full first premium is paid and a policy or

After receiving a check from Recupito for $57.28 made out to the defendant, Bannon filled in the blank spaces of the Conditional First Premium Receipt, dated it January 13, 1971, signed it, detached it from Part I of the first application, and placed it in Recupito's file kept at Bannon's office.

Because Recupito's wife was not present and it was late in the day (between 4:30 and 5:00 p.m.) and Bannon was ready to leave on a trip to New England for the remainder of the week, he instructed Recupito to take Part I of the second application (the one in which his wife was named as the proposed beneficiary), have her sign it on a line marked by an "X" indicating the place for the signature of the applicant or the proposed owner, have her make out a check of $57.28 to defendant for the first monthly premium, and mail the application and her check to his office at 1845 Walnut Street, Philadelphia, Pennsylvania. For that purpose, he supplied an envelope with his name and office address printed on it. He did not execute or detach the Conditional First Premium Receipt from Part I of the application.

Two days later, on Friday, January 15, 1971, Recupito's wife signed Part I of the second application at the place indicated by an "X," made out her personal check to defendant for $57.28, placed them in an envelope, and gave it to her daughter to mail. According to the daughter's affidavit, she deposited the self-addressed return envelope to Bannon in a mailbox in Drexel Hill, Pennsylvania, on Friday, January 15, 1971, at approximately 4:00 p.m. The scheduled pickup for mail at the mailbox in which she deposited the envelope was as follows: (1) Daily (except Saturdays, Sun-days and holidays): 9:00 a.m. and 4:00 p.m.; and, (2) Saturdays: 9:00 a.m.; and, (3) Sundays: 1:00 p.m.

On Sunday, January 17, 1971, at approximately 4:30 p.m., Recupito was killed in an automobile accident on Route 202 in the Borough of Tredyffrin, Chester County, Pennsylvania.

On the morning of the next day, while Bannon was at his home preparing to go to his office, he heard on the radio that Lincoln R. Kimberly was killed in a car accident. Lincoln Kimberly was an alias used by Recupito of which Bannon was aware. When he reached his office, Bannon called the radio station to confirm the report and the name of the person killed. He was not certain whether he did this before or after he opened the envelope mailed by Recupito's daughter and removed its contents. The envelope was postmarked "Upper Darby, Pa. Jan. 17, P.M.," [2] and contained the application for life insurance on the life of the deceased signed by his widow and her personal check for $57.28, representing the amount of the first premium. He wrote across the face of the envelope, "Received Monday 1–18–71 about 11:00 AM." He also signed the Conditional First Premium Receipt and detached it from the application. The blanks for the name of the payor of the premium (Recupito's widow), the amount of the premium ($57.28), and the date signed (January 18, 1971) were written in by either an employee of Bannon, the agency, or the defendant. On the same day, Bannon forwarded the application and check to defendant.

Proof of death and notice thereof was properly given to defendant by the named proposed beneficiaries in the applications, and demands were made for

---

contract is actually delivered to and accepted by the applicant during the continued good health of the Proposed Insured . . .

"C. If the Company declines to issue the insurance as applied for, or rejects the application, . . . it shall incur no liability under the application or this receipt, in which event the Company will return the amount paid upon surrender of this receipt.

"D. Any change in the terms or conditions of this receipt will render it void." (Italics supplied.)

2. Upper Darby is a municipality bordering on the City of Philadelphia of which Drexel Hill is a part.

the insurance proceeds on both policies applied for. By letter dated January 27, 1971, addressed to Otto Alden of Alden-Levine Associates, the vice president of defendant returned the two checks to cover the first premium on each of the applications because, in his underwriting judgment, the deceased was not a standard risk in accordance with the practices of defendant's underwriting and, therefore, stated that no insurance was in force at the time of decedent's death.

On June 30, 1971, decedent's widow and his parents joined as plaintiffs in bringing the diversity action here involved to recover the face amount of the insurance policies which they claimed were to be issued on the life of the deceased. The claim of the parents, Count I of the complaint, has been settled. All that is left is the claim by the widow under Count II of the complaint. In support of her motion for summary judgment, she argues that a contract of insurance for the face amount of the policy to be issued came into existence when her daughter deposited the envelope in the mailbox and, if not then, it certainly did when Bannon, a representative of defendant's general agent, signed the Conditional First Premium Receipt on January 18, 1971, the day after Recupito's death.

■ It is clear no written policy of life insurance was issued in this case. There is no evidence that the terms and conditions of a standard policy were to be effective prior to the issuance of the policy itself. The mere placing in the mail of a completed application with a check to cover payment of the first premium does not create a contract of life insurance. The application is but a proposal to contract. McAvoy Vitrified Brick Co. v. North American Life Assur. Co., 395 Pa. 75, 81, 149 A.2d 42, 45 (1959); Zayc v. John Hancock Ins. Co., 338 Pa. 426, 430, 13 A.2d 34 (1940); Munhall v. Travelers Ins. Co., 300 Pa.

327, 333, 150 A. 645 (1930); Toberg v. Knights of Columbus, 142 Pa.Super. 581, 16 A.2d 687 (1940). There could be no contract of full insurance until notice of acceptance of the application was given by some definitive act on the part of defendant. No such act occurred here. If plaintiff had been present at Bannon's office on Wednesday, January 13, 1971, had signed the second application on that day and presented to Bannon her personal check in the amount of the first premium, there is nothing in the record from which it may be reasonably inferred that Bannon would have done anything more than execute the Conditional First Premium Receipt, remove it from the application, and hand it over to her or retain it for her. However, the conditional receipt did not give plaintiff the right to recover on the policy. Therefore, defendant is entitled to judgment of dismissal on plaintiff's claim under the policy.

■ Plaintiff does not appear to be making any claim under the terms of the conditional receipt. However, even if we give Count II of the complaint the liberal reading required by the Federal Rules of Civil Procedure and construe it as making a claim in the alternative for the lesser amount,[3] in my opinion, she would not be entitled to recover under that receipt. The execution of the receipt did not bring interim coverage into existence for it was not timely issued. There is no indication in the record that Bannon had actual authority to effect interim coverage—when he knew that the proposed insured had already died, and he had no apparent authority to bind the defendant under the circumstances. See, 4 Appleman, Insurance Law and Practice, § 2291, p. 244; Moffett v. Texas Employers Ins. Ass'n, 217 S.W.2d 142, 144 (Tex.Civ.App.1948).

The motion of the defendant for summary judgment will be allowed.

---

3. Under Rule 8(e)(2), Fed.R.Civ.P., a plaintiff may set forth claims in the alternative regardless of consistency.